UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSEPH AND MARK MCCORMICK,

Plaintiffs,

v.                                                              Case No. 12-C-763

INDEPENDENCE LIFE AND
ANNUITY COMPANY,

Defendant.

**DECISION AND ORDER**

Plaintiffs Joseph C. and Mary C. McCormick filed this action against their insurer, Defendant Independence Life and Annuity Company (Independence), alleging that they have been systematically overcharged for interest on a loan Plaintiffs took out on their policy in 1987. The amended complaint asserts claims for breach of contract, declaratory and injunctive relief, breach of fiduciary duty and bad faith. Plaintiffs also assert a federal claim for violation of the Securities Act of 1933 on the ground that the prospectus issued at the time the policy was purchased was misleading. Plaintiffs assert the breach of contract claim is on behalf of themselves and others similarly situated. No class has yet been certified, however, and Independence has filed a motion to dismiss. For the reasons given below, the motion will be granted.

**I. BACKGROUND**

Plaintiffs are the owners of a variable life insurance policy they purchased in 1987 from a predecessor of Independence Life and Annuity Company. Like many such policies, the policy

allows the insureds to take loans, with the cash value of the policy serving as collateral. Plaintiffs

took out a loan against the policy and did not pay the annual interest, which was to accrue at 4.7%.

They allege, however, that the policy automatically deducted their annual payment and thus, when

Independence charged them additional interest, it was overcharging them. Because these arguments

involve an extensive analysis of the policy language, I will set forth the policy language in detail in

Section II below.


## II.  ANALYSIS

### A.  Motion to Dismiss

A threshold question is whether the Defendant's argument is properly addressed through a

motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  Plaintiffs protest that their assertions are

contested facts that must be addressed through summary judgment or trial, but here the Court is

merely asked to interpret policy language based on documents that were referred to in the complaint.

Documents that form the basis of the plaintiff's claims are properly considered in deciding a Rule

12(b)(6) motion to dismiss. *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 604 n.2 (7th Cir. 2013).

Moreover, contrary to Plaintiffs' assertions, a court need not take as "true" the amended complaint's

allegation that the Defendant failed to comply with the terms of the policy.  A court may readily

interpret those terms and make that determination itself particularly where, as here, there are no

factual disputes requiring resolution. *See Ogden Martin Systems of Indianapolis, Inc. v. Whiting

Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) ("[W]here the allegations of a pleading are inconsistent

with the terms of a written contract attached as an exhibit, the terms of the latter, fairly construed,

2

must prevail over the averments differing therefrom.") (internal quotation marks omitted). Accordingly, the matters raised are properly considered in the context of a motion to dismiss.

## B. Policy Interpretation

The policy at issue here is a single premium variable life insurance policy. "Single premium" means that the insured funds the life insurance policy at the outset (rather than paying premiums over time) in return for a benefit upon death. The insured's deposit (here it was $25,000) will generally be allocated to various sub-accounts, which are investment accounts that the policyholder may participate in, and these include funds investing in money markets, bonds, and equities, depending on the goals and risk profile of the policyholder. (ECF No. 34-1 at 15.) Thus, the goal is that the sub-accounts will grow over time to provide a death benefit much larger than the original premium. Because there is an equity component of the insurance ("cash value"), insureds may occasionally deem it useful or necessary to borrow from that amount. The "Policy Loans" clause provides that when a policyholder takes out a loan, the insurer will transfer that amount out of the sub-accounts as collateral for the loan:

> Assets equal to the amount of the loan will be taken by proportion from the Sub-Accounts, unless you request otherwise. These assets will be transferred to our general account and will earn interest at the rate of 4% a year.

(ECF No. 34-1 at 9.)

And although those transfers earn 4% a year for the insured (instead of whatever return the money would have realized in the sub-accounts), the insurer charges 4.7% a year as interest on the amount of the loan. It also requires that the interest be paid annually, or else "it will be added to the principal of the loan and will bear interest." (ECF No. 34-1 at 9.)

The Plaintiffs did not pay the interest on their loans, strictly speaking. Instead, they argue that although they did not write checks to Independence to cover the interest every year, they "paid"

3

the interest by virtue of the Policy Loans clause quoted above. That is, when they did not pay the interest, the outstanding interest was "added to the principal of the loan." (*Id.*) Once the unpaid interest was added to the "loan" itself, it then became subject to the Policy Loans clause stating that "Assets equal to the amount of the loan . . . will be transferred to our [Independence's] general account." (*Id.*) As Plaintiffs put it, "The [interest] payments were made when Defendant removed the 4.7% interest charge annually from the Plaintiffs' Sub-Accounts. Since the loan interest was paid each year, it was improper for Defendant to compound interest thereafter resulting in yearly overcharges." (ECF No. 36 at 7.) In other words, Plaintiffs believe the policy itself *automatically* "paid" the interest by removing funds from sub-accounts and transferring them to Independence's "general account."

Independence has a much different interpretation. According to Independence, the purpose of the Policy Loans clause is to secure the collateral of the loan from the market risk exposure of the sub-accounts. In other words, the insurer moves funds from the investment sub-accounts (which may be exposed to risk) into the "general account" (which is not) in order to protect the assets backing the policy loan amount: "Assets equal to the amount of the loan . . . will be transferred to our general account." (*Id.* at 9.) In effect this is no different than an auto loan that requires the borrower to maintain insurance on the car in order to protect the lender's collateral. In addition to securing the funds in an amount equal to the loan amount, the policy provides that the insurer charges interest on the loan to be paid annually at the rate of 4.7%. "If the interest is not paid by the end of the policy year, it will be added to the principal of the loan and will bear interest." (ECF No. 34-1 at 9.) Thus, if the insured takes out a loan and fails to pay the interest on it, that interest gets rolled into the principal amount, and then that amount gets subtracted from the sub-accounts to cover the amount the loan increased due to the failure to pay the interest.

An example may better demonstrate how the loan feature of the policy works. Suppose a policyholder borrows $1,000 from the policy. The holder would get a check for $1,000, and the same amount would be removed from his sub-accounts and placed in the "general account." Then suppose at the end of the year he fails to pay the $47.00 he owes in interest. That amount would then be rolled into the principal of the loan, meaning that he now would owe $1,047. That $47.00 would also be transferred from the sub-accounts to the general account as security to back the additional value of the loan. The amount in the general account then reflects the total loan indebtedness of $1,047. The holder is not out the entire $47 in interest, however. Per the policy terms, the original $1,000 transferred from the sub-accounts to the general account has itself been bearing interest at a rate of 4%. Thus, $40 (4% of $1,000) is credited back to the policyholder. The sub-account from which the $1,000 was originally transferred thus does not lose $47 (4.7% interest) but only $7. That is, even though the amount of security for the loan—the amount in the *general* account—reflects the entire amount of the loan (now $1,047), the sub-accounts are reduced only by the amount of the original loan *plus* the net 0.7% interest, or $7. Under this reading, the transfer of assets from the sub-accounts to the general account is not a "payment" of interest but merely a transfer of funds to *secure* that interest.

Independence's reading is more reasonable for a number of reasons. First, the main confusion appears to arise out of the transfer of funds from the sub-accounts to the general account. It is perhaps understandable why an insured might think he was "paying" the interest because money was being transferred to Independence's general account. But the policy itself makes clear that money in the general account remains part of the policy's cash value, *not* part of the insurer's own assets. "Cash Value," as defined by the policy, includes "b) any assets transferred to the general investment account of the Company because of any indebtedness under this policy." (*Id.* at 8.)

Thus, although Plaintiffs claim they are paying down the interest through the normal operation of the policy, the language of the policy states that they are not "paying" the interest at all but merely shifting money between accounts.

Second, the policy itself contemplates that holders will actually pay the interest in the traditional sense: "If the interest is not paid by the end of the policy year, it will be added to the principal of the loan and will bear interest." (*Id.* at 9.) This clause would make no sense under Plaintiffs' reading, because under their reading the interest is *automatically* paid through deductions from the sub-accounts. There would never be a scenario in which interest would be "not paid" because it would always be "paid" through the Policy Loans clause. In addition, the quoted clause states that the unpaid interest itself will bear interest—exactly what Plaintiffs allege occurred here. Under Plaintiffs' theory, they should not have been charged interest on the unpaid interest because that unpaid interest was actually "paid"—but the quoted clause explicitly informs policyholders that failure to pay the interest would result in additional interest.

Finally, the Policy Loans clause is the clause that indicates that the money transferred will *pay* interest: "These assets [from the Sub-Accounts] will be transferred to our general account and will earn interest at the rate of 4% a year." (ECF No. 34-1 at 9.) In Plaintiffs' view, recall, the money transferred is interest "paid." But it would not make sense to pay interest to another party (an insurer, a bank, or anyone else) and then have the insurer turn around and pay *you* interest *on the interest you've paid it.* That kind of transaction does not find a comfortable place in logic, even in the world of finance. Instead, the only way one could expect to receive interest on a sum of money is if that money is actually one's own. Here, the money is transferred to a general account and redounds to the cash value of the policy. To protect it, the money gets a safe 4% return instead

6

of whatever return might be obtained through the sub-account investments. This was not, in other words, money that had been "paid" to the insurer.

In sum, Plaintiffs' theory is that the insurer overcharged them because it was not accounting for the annual interest payments they were automatically making by virtue of the Policy Loans clause. But because funds transferred pursuant to that clause were not interest payments, Plaintiffs' theories of liability fail. Because the interest had not been paid, the insurer was entitled to charge interest on the unpaid interest—as the policy itself warned—resulting in an effective rate of interest higher than 0.7%. The Plaintiffs' misreading of the policy is the foundation of most of their claims (breach of contract and fiduciary duty, bad faith, declaratory relief), and thus all of those claims are subject to dismissal.[1]

## C. Securities Fraud 15 U.S.C. § 77l(a)

Plaintiff's Securities Act claim alleges that Independence's predecessor sent a prospectus to the Plaintiffs describing the policy. In particular, the amended complaint alleges that the prospectus asserted that interest on policy loans would be deducted from the policy's cash value if not paid when due. (ECF No. 31 at ¶ 63.)[2]

---

[1] All of these claims are based on the alleged wrongful failure to credit Plaintiffs with interest payments. (ECF No. 31 at ¶¶ 49, 54, 73, 78.)

[2] I note that the prospectus does appear to make the assertion Plaintiffs claim, however. (ECF No. 37-3 at 3) ("The interest on the policy loan balance is due on policy anniversaries and will be deducted from the Policy's cash value if not paid when due.") The prospectus does not appear to be incorporated into the policy itself. ("This policy with the attached application and papers is the entire contract.") (ECF No. 37-1 at 7.) In any event, the Plaintiffs' argument is that the prospectus and the policy are "entirely consistent." (ECF No. 36 at 11.) That is, they do not rely on the prospectus for any contract rights, but merely as evidence that their interpretation of the policy itself is correct.

Section 12(a)(2) of the Securities Act of 1933 provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication" containing a materially false statement or material omission "shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77l(a)(2). Independence argues that the Securities Act claim is barred by the repose statute. Section 13 of the Securities Act contains a three-year statute of repose: "In no event shall any such action be brought to enforce a liability created under [§ 11 or § 12(a)(1) ] of this title more than three years after the security was bona fide offered to the public . . . ." 15 U.S.C. § 77m. Here, the policy was offered and accepted in 1987, some twenty-seven years ago. The statute of repose would therefore seem to bar this action.

Plaintiffs first argue that their purchase of the insurance policy is ongoing because they continue to make payments on it due to shortfalls owing to the insurer's charging of interest on interest. As such, they believe their injury is ongoing, meaning that the injury is renewed with each premium they pay. Plaintiffs have no support for this argument, however. The statute itself sets the trigger as the day the security was "offered," and that would suggest the date the security was *first* offered. This is how courts have interpreted the phrase. *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 100 (2d Cir. 2004) ("the vast majority of courts to consider § 13 have impliedly or expressly found that the three-year period begins when the security is first bona fide offered.) (citing *Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1168 (7th Cir.1995)). The claim thus expired more than two decades ago.

Plaintiffs also argue that equitable tolling should apply, but equitable tolling does not apply to statutes of repose. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363 (1991) (noting that "Congress did not intend equitable tolling to apply in actions under the securities laws."); *Stoltz,* 355 F.3d at 102-103 ("a statute of repose begins to run without interruption once the

8

necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action.") Equitable tolling looks at things from the plaintiff's perspective, whereas a statute of repose takes the opposite view, creating an absolute date after which a potential defendant may enjoy the repose that comes from knowing any claims are now expired. Here, even if equitable considerations warranted tolling, such relief would be unavailable.

## III. Conclusion

For the reasons given above, the motion to dismiss is **GRANTED** and the case is **DISMISSED** with prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this ___18th___ day of March, 2014.

   s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court